## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                              Case No. 22-cr-79 (NEB/TNL)

　　　　　　　　　　　Plaintiff,

v.                                                     **REPORT & RECOMMENDATION**

Jyron Mendale Young,

　　　　　　　　　　　Defendant.

Thomas Calhoun-Lopez, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Steven J. Wright, Law Office of Steven J. Wright, 331 Second Avenue South, Suite 705, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Jyron Mendale Young's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, ECF No. 21, and Motion to Suppress Statements, Admissions, and Answers, ECF No. 22. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy E. Brasel, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. Local Rule 72.1.

A hearing on the motions was held June 30, 2022. ECF No. 32. Assistant United States Attorney Jordan Sing appeared on behalf of the United States of America (the

"Government"). Attorney Steven J. Wright appeared on behalf of Defendant. Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.

## II. FINDINGS

At the June 30 hearing, the Court heard testimony from Officer Amanda Johnson, a licensed peace officer with the Richfield Police Department. The Government offered and the Court received: Exhibits G-1 through G-6, photos of the vehicle involved in this case and the items found inside the vehicle; and Exhibit G-7, the Richfield Police Department's policy on vehicle impoundment. Defendant offered and the Court received: Exhibit D-1, the body camera video of Bloomington Police Department Officer Christopher Wegner; and Exhibit D-2, the body camera video of Minneapolis Police Department Officer Nicholas Sciorrotta, Jr.

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A. Background

Officer Johnson has been employed with the Richfield Police Department for ten years. Tr. 9:18-20, ECF No. 35.[1] Officer Johnson works in the investigations division, where she investigates crimes ranging from petty thefts to homicides. Tr. 9:21-10:1. As an officer with the investigations division, Officer Johnson drives an unmarked Ford Fusion, and she wears plainclothes instead of a uniform. Tr. 10:2-4, 11:5-8. She wears a police badge on her belt that sits in front of her gun and holster, so, according to Officer

---

[1] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redactions was due July 20, 2022, and no such notice was filed. ECF No. 35.

Johnson, "if you see [her] gun, you see [her] badge." Tr. 11:1-12:7, 52:10-16. Every time she takes any kind of law enforcement action, she tucks her shirt in so that her shirt is behind her badge, making the badge "very visible." Tr. 11:25-12:7.

On February 16, 2022, at approximately 12:50 p.m., Officer Johnson was on duty and received a call regarding a vehicle that had been stolen out of Richfield. Tr. 10:5-17. Officer Johnson learned that the stolen vehicle, a black Jeep, was located on the 2600 block of 17th Avenue in Minneapolis. Tr. 10:18-11:4, 13:6-8. Officer Johnson learned that officers had observed the person they suspected stole the Jeep outside of 2637 17th Avenue. Tr. 12:13-17, 33:22-34:6. Officer Johnson also learned that the victim of the stolen Jeep was called to recover their vehicle, and as the victim was arriving to the 2600 block of 17th Avenue to get their vehicle, officers observed a white GMC Yukon pull up in front of the same address that officers had seen the suspect leaving from earlier. Tr. 12:17-19.

Officer Johnson responded to the 2600 block of 17th Avenue in Minneapolis. Tr. 10:18-11:4. When she arrived, she saw the GMC Yukon[2] and noticed that it did not have any plates or markings for registration on it. Tr. 12:20-24. She testified that was concerning to her because typically vehicles involved in criminal activity or that are stolen will have the plates removed. Tr. 12:25-13:5. She also testified that the location of the GMC Yukon was suspicious to her because it was sitting directly in front of the stolen Jeep's suspect's address. Tr. 50:19-22.

---

[2] It is undisputed that the GMC Yukon is not the stolen vehicle that Officer Johnson was called to assist with. Instead, the GMC Yukon was the vehicle that parked in front of the address where the suspect of the stolen Jeep was observed. *See* Tr. 33:19-21 (Officer Johnson testifying, "I believe it was a black [J]eep that had been stolen. So [the GMC Yukon] is unrelated to that stolen vehicle.").

Officer Johnson testified that from her position in her Ford Fusion, it was difficult to see the driver of the GMC Yukon because it "sits up pretty high." Tr. 40:8-13. She testified that she was able to get "a pretty quick glimpse" of the driver and, while "[i]t was difficult to see," she observed that the driver of the GMC Yukon was a black male. Tr. 13:9-12, 39:18-20, 40:14. She testified that she "saw a black male with short hair and not like a big chubby face or anything like that, just generally, and that's all [she] got a glimpse of." Tr. 40:14-17.

Officer Johnson was aware that the suspect of the stolen Jeep was a black male named Willie Scott, Jr. Tr. 13:16, 39:21-22. Officer Johnson was also familiar with his appearance, including that he had facial tattoos, as she had seen surveillance video of him. Tr. 39:21-40:4. Officer Johnson testified that the physical description of the suspect, Mr. Scott, was "[s]imilar enough [to Defendant] that at that glance it was worth checking into further." Tr. 50:23-51:1. She also testified that another reason she thought the driver of the GMC Yukon could be Mr. Scott was because the vehicle parked right in front of the address where the Mr. Scott had been seen earlier by officers. Tr. 40:17-21.

## B. Initial Contact with Defendant

Officer Johnson backed up her Ford Fusion so that she was just behind the GMC Yukon. Tr.13:18-22. She exited her vehicle, tucked in her shirt so that her badge would be visible, and approached the driver's side of the GMC Yukon. Tr. 13:22-25, 40:22-41:2. Officer Johnson then tapped on the driver's side window. Tr. 14:3-7, 51:19-21. She saw two people in the vehicle. Tr. 34:7-15. The driver, later identified as Defendant Jyron Mendale Young, did not roll the window down. Tr. 14:7-8, 17:9-15. Officer Johnson tried

4

to speak with Defendant through the window, loud enough that she believed he would have been able to hear her through the window, by asking him about the registration for the vehicle. Tr. 14:7-12, 51:24-52:1. Defendant did not respond, put the vehicle in gear, and fled in the vehicle. Tr. 14:13-14, 52:4-5. Officer Johnson testified that she was not able to identify herself as a police officer before Defendant fled. Tr. 41:6-7.

Officer Johnson testified that she made eye contact with Defendant when she tapped on the GMC Yukon's window. Tr. 51:22-23. She testified that she knew in that moment that Defendant was not Mr. Scott. Tr. 41:3-15, 52:25-53:1. She testified that Mr. Scott's facial tattoos are "not exactly a match" to Defendant's facial tattoos. Tr. 40:5-7.

### C. Pursuit and Arrest of Defendant

Defendant drove the GMC Yukon up over the curve, over the sidewalk, then crossed over the road, went up onto the sidewalk and through some yards on the opposite side of the road, then drove back onto the road. Tr. 14:15-15:5. Officer Johnson pursued Defendant and radioed to request assistance from the Minneapolis Police Department (MPD). Tr. 35:20-23. Officer Johnson did not turn on her lights or sirens. Tr. 53:6-8. The GMC Yukon ultimately came to a stop when it went through a yard and crashed into a fence. Tr. 15:7-11. She testified that she knew the GMC Yukon was inoperable because she could hear the engine revving and saw the tires spinning, but it was not moving. Tr.15:16-22.

When Officer Johnson caught up to the GMC Yukon, Defendant was still in the driver's seat. Tr.15:23-24. After Defendant revved the engine and was not able to drive away, he exited the vehicle and fled on foot. Tr. 15:25-16:4. Officer Johnson and another

officer who was there to assist, Bloomington Police Department Officer Christopher Wegner, pursued Defendant on foot.  Tr. 16:20-17:1.

Officer Wegner's body camera captured his pursuit and arrest of Defendant.  *See* Ex. D-1.  Officer Wegner radioed to other officers, "The suspect is fleeing in the vehicle . . . and just crashed."  *Id*. at 00:51-00:58.  Officer Wegner, wearing plainclothes, then got out of his vehicle and ran after Defendant.  *Id*. at 00:58-01:19.  Officer Wegner yelled to Defendant, "Police! Stop!"  *Id*. at 01:19-01:20.  Defendant continued running down the sidewalk and away from Officers Wegner and Johnson.  *See id*. at 01:16-01:27.  Officer Wegner again yelled, "Stop!"  *Id*. at 01:25.  Officer Wegner ultimately caught up with Defendant and took him to the ground.  Tr. 16:22-23; *see also* Ex. D-1 at 01:27-01:29.

Officer Johnson testified that Defendant was on the ground with Officer Wegner on top of him by the time she caught up to them.  Tr. 45:17-46:2.  Officer Johnson testified that Defendant was not cooperative with the apprehension and was twisting his body and kicking his feet.  Tr. 16:24-17:5.  As Officers Wegner and Johnson held Defendant on the ground, held his hands behind his back, and radioed for assistance, Defendant said, "I didn't do shit," and repeatedly asked, "What did I do?"  Ex. D-1 at 01:29-02:11.  Defendant asked, "Who are you people?"  *Id*. at 02:10-02:11.  Officer Wegner responded that he is a Bloomington police officer.  *Id*. at 02:12-02:16.  Officer Johnson then asked Defendant, "What's your name even?  We were looking for somebody else.  The reason I started talking to you [was be]cause you don't have plates on your car."  *Id*. at 02:33-02:40. Officers were ultimately able to arrest Defendant and later identified him as Jyron Woodard, also known as Jyron Young.  Tr. 17:6-15.

### D. Search of GMC Yukon

After Defendant was in custody, Officer Johnson returned to the disabled GMC Yukon. Tr. 17:21-23. She testified that she went over to the GMC Yukon because she wanted to (1) make sure the passenger that she had seen earlier was safe, (2) secure the GMC Yukon, and (3) secure her own vehicle. Tr. 17:24-18:3, 34:7-15.

Officer Johnson testified that she walked over to the GMC Yukon at about the same time as Officer Wegner did, as they were both relieved by the MPD officers at the same time. Tr. 42:13-22. Officer Wegner's body camera video shows that after arresting Defendant, Officer Wegner ran back to the GMC Yukon, stood near the driver's side door, and looked into the vehicle through the windows. *See* Ex. D-1 at 03:50-05:10. Shortly thereafter, Officer Wegner said to Officer Johnson, "If you look on the driver's seat you'll know why he ran." *Id.* at 06:30-06:32. Officer Wegner also later told the other officers on scene, "There's a big ole bag of dope in the front." *Id.* at 07:25-07:27.

Officer Johnson testified that she looked into the GMC Yukon and did not locate anyone else. Tr. 18:4-6, 34:13-23. She testified that she did not see the passenger exit the vehicle because the passenger door was not visible from where her vehicle was positioned. Tr. 35:6-8. Officer Johnson then took photos of the front and back of the GMC Yukon. Tr. 18:7-22; *see also* Exs. G-1, G-2.

Officer Johnson then testified that, as depicted in Exhibits G-2 and G-3, the GMC Yukon's driver's side door was open. Tr. 18:23-19:2, 19:20-21, 37:20-38:3, 45:12-14. She testified that she saw Defendant open the door when he exited the GMC Yukon and fled, and no one else, including law enforcement, had interacted with the vehicle since. Tr. 19:3-

7

12, 19:22-25, 41:16-21.  She testified that the MPD officers responded to assist and secured the car, meaning that they made sure nobody got in or out of the vehicle.  Tr. 35:19-23, 41:22-42:7.  According to Officer Johnson, the MPD officers did not go into the vehicle, and just made sure that the car did not take off again.  Tr. 42:7-8.

Officer Johnson then looked inside the GMC Yukon through the open driver's side door.  Tr. 19:13-15, 20:3-6.  She observed a Taurus 380 pistol on the driver's side floorboard of the GMC Yukon.  Tr. 19:16-19, 20:7-15; *see also* Exs. G-3, G-4. Officer Johnson put on a fresh pair of gloves and grabbed a new paper bag and took custody of the firearm.  Tr. 20:16-18.  She did a safety check on the firearm by pulling the slide back to eject any rounds that were in the chamber and dropping out the magazine to make sure it cannot be reloaded.  Tr. 20:19-25.  During the safety check, Officer Johnson located one round in the chamber and other rounds in the magazine.  Tr. 21:1-4.

Officer Johnson also observed a magazine for a full-size gun that appeared to be extended and a crystalline substance in a plastic baggy on the driver's seat of the vehicle. Tr. 21:5-12; *see also* Exs. G-3, G-5.  Based on her training and experience, Officer Johnson believed the substance to be methamphetamine.  Tr. 22:2-7.  The substance later field-tested positive for methamphetamine.  Tr. 22:8-11.  In the center console, Officer Johnson located a couple five dollar bills and suspected heroin.  Tr. 22:12-17; *see also* Ex. G-6. Officer Johnson testified that she suspected the substance was heroin based on its color and texture.  Tr. 22:21-25.  Officer Johnson also located rounds of .380 caliber ammunition, which are the same caliber ammunition as the handgun that was located on the floorboard of the GMC Yukon.  Tr. 22:12-17, 23:1-7; *see also* Ex. G-6.  She testified that she could

8

see all this contraband, including the firearm, extended magazine, and suspected narcotics, through the open driver's side door without moving anything. Tr. 35:24-37:16. Officer Johnson also located a .9 millimeter handgun magazine in the driver's side door of the vehicle. Tr. 23:8-10. Lastly, Officer Johnson located the license plates for the GMC Yukon in the back of the vehicle. Tr. 23:14-17. Officer Johnson testified that was relevant to her because in her experience, removing license plates from a vehicle is generally done to conceal the identity of the vehicle and conceal who is driving it. Tr. 23:18-23.

Officer Johnson later checked the registration of the GMC Yukon and learned that it was not registered to Defendant. Tr. 23:24-24:2. Defendant was not using keys to drive the GMC Yukon and the ignition appeared to be punched, meaning that a screwdriver or similar object was used to overcome the normal ignition process and start the vehicle without the keys. Tr. 24:3-18. Officer Johnson testified that the ignition appeared to be damaged, and the vehicle was still running without the keys. Tr. 24:5-9.

Officer Johnson testified that based on her training and experience, there was evidence of potential criminal activity in the GMC Yukon, including the controlled substances, the firearm, and money. Tr. 24:24-25:5. Officer Johnson also believed the vehicle might have been stolen. Tr. 25:6-8. Given the status of the vehicle, Officer Johnson opted to have it towed. Tr. 25:14-16. Officer Johnson testified that the GMC Yukon was towed consistent with the Richfield Police Department's policy for vehicle impoundment. Tr. 25:17-21; *see also* Ex. G-7. Officer Johnson testified that under the circumstances, the policy required a search of the GMC Yukon because it requires officers to "take anything of value for safe keeping" to "protect[ ] the tow truck driver for claims of theft and damage"

9

and "protect the vehicle's owner occupants from having anything stolen out of it."  Tr. 26:1-11.

### E.   Search of Defendant's Person

Officers also searched Defendant's person.  Tr. 26:12-16.  Officers located a .9 millimeter round and a .380 round on Defendant's person, which was significant to Officer Johnson because she had located a .380 handgun and .9 millimeter magazine in the GMC Yukon Defendant was driving.  Tr. 26:19-27:1.

Defendant was then placed in an ambulance and taken to Hennepin County Medical Center (HCMC) by other officers.  Tr. 27:2-4, 27:18-20, 47:1-4; *see also generally* Ex. D-2.  Defendant was taken to HCMC because he had a cut on his forehead and claimed to have ingested one gram of heroin.  Tr. 27:5-10, 46:15-17, 47:5-11.  Officer Johnson testified that she observed a small cut on Defendant's head that was "bleed[ing] pretty significantly" and required medical assistance.  Tr. 46:3-17, 49:22-50:4.  She did not notice any blood inside the car and only noticed blood on Defendant's head and on the ground underneath where he was arrested.  Tr. 46:7-14; *see also, e.g.,* Ex. D-1 at 02:31, 03:37.  She testified that when officers were placing Defendant under arrest, he seemed confused about what was going on.  Tr. 46:18-20, 49:17-21.  Officer Johnson also testified that while Defendant claimed that he swallowed a gram of heroin, "[n]obody actually saw him do any of that."  Tr. 47:5-11.

### F.  Buccal Swab & Statements by Defendant

Officer Johnson later went to HCMC "[t]o ensure that [Defendant] stayed in custody," as officers are required to stay with arrestees to ensure that they maintain their

in-custody status before being taken to jail. Tr. 27:12-17, 27:21-23. Officer Johnson also went to HCMC to request that Defendant provide an optional DNA sample via a buccal swab. Tr. 28:5-9.

At the hospital, Officer Johnson asked Defendant if he would provide a DNA sample via a buccal swab. Tr. 28:10-11. According to Officer Johnson, Defendant "consented and said that he would." Tr. 28:12-13. Officer Johnson testified that Defendant's demeanor was calm and normal, and that he was "relaxing in the hospital bed." Tr. 28:14-16. According to Officer Johnson, Defendant seemed to understand the question she was asking him, did not appear distraught, frightened, or intoxicated, and appeared to be alert. Tr. 28:17-29:3. Officer Johnson testified that she did not make any threats to Defendant, did not brandish her firearm, did not lie to Defendant about why she was there, and did not promise Defendant anything in return for the sample. Tr. 29:8-16. Officer Johnson then obtained a DNA sample from Defendant. Tr. 29:4-7. Officer Johnson testified that based on her interactions with Defendant, his consent was coherent and he knew what he was doing. Tr. 29:17-21.

Officer Johnson testified that after collecting the DNA sample, Defendant "initiated more conversation." Tr. 29:22-25. According to Officer Johnson, Defendant asked her "what his charges would be." Tr. 30:1-3, 47:23-48:1. Officer Johnson testified that:

> [She] mentioned the firearm in the vehicle. [She] mentioned
> that [she] assumed it was probably stolen, so that would be an
> additional charge, and then [she] talked about the amounts of
> the drugs and believed based on what [she] saw it was probably
> a second or third degree possession charge.

Tr. 30:6-12. In response to Officer Johnson saying that the gun was probably stolen,

Defendant said, "Probably." Tr. 30:13-15. In response to Officer Johnson mentioning potential drug charges, Defendant "asked how much time he would get for 20 grams of meth and four grams of heroin." Tr. 30:16-21. Officer Johnson testified that she looked up the Minnesota criminal statutes on her phone for him to go through. Tr. 30:21-22. She also testified that the amounts of methamphetamine and heroin that Defendant asked about generally match the amounts recovered from the GMC Yukon. Tr. 30:23-25. Defendant told Officer Johnson that he was "trying to make money" in the GMC Yukon. Tr. 31:13-15. Officer Johnson testified that she assumed the gun recovered from the GMC Yukon was stolen because "[t]he majority of guns that [officers] find on people that are prohibited from possessing or obtaining a gun legally are stolen." Tr. 48:2-7. She testified that she questioned "in [her] head" whether the gun was stolen, but she did not pose that question to Defendant. Tr. 48:8-11.

During the conversation, Defendant also mentioned that "he saw [Officer Johnson's] firearm," which was located behind her badge when she approached the GMC Yukon. Tr. 31:1-10, 52:6-9. Officer Johnson testified that she assumes that Defendant saw her badge because she displayed both, though she "can't testify to what [Defendant] can see." Tr. 52:22-24. Officer Johnson testified that she is certain that she displayed her badge "[b]ecause it's [her] habit that whenever [she] get[s] out of [her] vehicle to make contact with people or [goes] into a business or anything, [she] make[s] sure that [her] badge is visible because if [she is] displaying a gun, [she is] going to make sure that [her] badge is visible." Tr. 51:5-16. She testified that she is absolutely certain that she displayed her badge. Tr. 52:17-18.

Officer Johnson testified that Defendant started this conversation with her by asking what his charges would be. Tr. 31:21-22. Officer Johnson testified that she responded to Defendant's unprompted questions, but she did not ask Defendant any questions and did not initiate any topics of conversation with Defendant. Tr. 31:16-24. Officer Johnson said that she did not ask Defendant anything substantive. Tr. 33:5-7. Officer Johnson also testified that everything that she put in her report about the statements Defendant made to her were "voluntary utterances by him without questions prompted." Tr. 32:7-12. Officer Johnson testified that this conversation went on for about ten minutes, and that it lasted that length only because she was trying to find the applicable statutes for Defendant on her phone. Tr. 31:25-32:6.

Officer Johnson later asked Defendant if he wanted to be interviewed. Tr. 32:13-17. Defendant declined. Tr. 32:18-19. Officer Johnson testified that she did not ask Defendant any questions or have any other substantive conversation with Defendant after that. Tr. 32:22-33:4. Officer Johnson also testified that she had an app on her phone that she could turn on to record a statement, and that she would have turned it on if Defendant would have agreed to provide a statement. Tr. 47:15-18. She testified that she did not record her interaction with Defendant at HCMC. Tr. 47:21-22, 50:6-8.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned makes the following conclusions of law. With respect to Defendant's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, ECF No. 21, Defendant argues that (1) the evidence recovered from the search of Defendant's person must be suppressed because officers

lacked the necessary probable cause to arrest Defendant; (2) the evidence recovered from the search of the GMC Yukon must be suppressed because the search was not constitutionally justified; and (3) the evidence from the DNA swab must be suppressed because Defendant's condition made it impossible for him to consent voluntarily to the DNA swab. Def.'s Mem. in Supp. at 2-16, ECF No. 36. With respect to Defendant's Motion to Suppress Statements, Admissions, and Answers, ECF No. 22, Defendant argues that his statements must be suppressed because (1) he was subjected to custodial interrogation without the benefit of *Miranda* warnings; and (2) in the alternative, his statements were not voluntary given his medical condition. Def.'s Mem. in Supp. at 16-18.

### A. Warrantless Arrest and Search of Defendant's Person

Defendant first argues that "[t]he officers here arrested [Defendant] without probable cause, which led to an unlawful search of his person." *Id*. at 2. Defendant does not challenge Officer Johnson's initial approach of Defendant. Instead, Defendant contends that the officers lacked probable cause to arrest Defendant because Officer Johnson "knew immediately upon looking at [Defendant] up close that he was not the suspect in the stolen-car investigation." *Id*. at 4. Further, Defendant argues that while the officers suspected the GMC Yukon might have been stolen, there is no indication in the record that it actually was. *Id*. Defendant also contends that he did not flee from officers because neither Officer Johnson nor Officer Wegner ever identified themselves as police officers. *Id*.

A warrantless arrest by law enforcement is reasonable only if supported by probable cause. *United States v. Green*, 9 F.4th 682, 690 (8th Cir. 2021). Probable cause for a warrantless arrest exists when facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense. *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008) (citing *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007)); *see also United States v. Rivera*, 370 F.3d 730, 733 (8th Cir. 2004) ("Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed.").

"Probable cause is a practical and common-sensical standard that is based on the totality of the circumstances and requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quotation omitted). It is assessed "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case." *United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) (quotation omitted). "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted).

In the end, "[p]robable cause 'is not a high bar.'" *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It "requires only a probability or substantial chance of

criminal activity, not an actual showing of such activity." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013).

As the Government points out, the Eighth Circuit Court of Appeals has "consistently held that a defendant's response to an arrest or *Terry* stop—even an invalid one—may constitute independent grounds for arrest." *United States v. Flores-Lagonas*, 993 F.3d 550, 560 (8th Cir. 2021) (citing cases); *see* Gov't's Mem. in Opp. at 10, ECF No. 37. Here, Defendant attempted to flee from law enforcement both in his vehicle and on foot, each of which is a crime under Minnesota law. This gave the officers probable cause to arrest Defendant.

First, Defendant attempted to flee from law enforcement by driving away after Officer Johnson approached the driver's side of the GMC Yukon, tapped on the window, and asked him about the registration on vehicle. Under Minnesota law, "[w]hoever by means of a motor vehicle flees or attempts to flee a peace officer who is acting in the lawful discharge of an official duty, and the perpetrator knows or should reasonably know the same to be a peace officer, is guilty of a felony . . . ." Minn. Stat. § 609.487, subd. 3; *see also* Minn. Stat. § 609.487, subd. 1 (defining "flee" as "to increase speed, extinguish motor vehicle headlights or taillights, refuse to stop the vehicle, or use other means with intent to attempt to elude a peace officer following a signal given by any peace officer to the driver of a motor vehicle").

Second, officers also had probable cause to arrest Defendant for fleeing on foot, in violation of Minn. Stat. § 609.487, subd. 6. Under Minnesota law, "[w]hoever, for the purpose of avoiding arrest, detention, or investigation, or in order to conceal or destroy potential evidence related to the commission of a crime, attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running, hiding, or by any other means except fleeing in a motor vehicle, is guilty of a misdemeanor." Minn. Stat. § 609.487, subd. 6. Once Defendant crashed the GMC Yukon into the fence and came to a stop, Defendant exited his vehicle and ran. Tr. 16.20-17:1. As such, officers had probable cause to arrest Defendant for fleeing on foot. Accordingly, Defendant's flight, both in his vehicle and on foot, provided a basis to arrest him. *See Flores-Lagonas*, 993 F.3d at 560-61.

Defendant argues that Officer Johnson and Officer Wegner never identified themselves as police officers. Therefore, according to Defendant, officers did not have probable cause to arrest him for fleeing police. The question, however, is not whether law enforcement identified themselves as police officers, but rather, whether Defendant knew *or should reasonably have known* they were police officers. *See* Minn. Stat. § 609.487, subd. 3. Officer Johnson testified credibly that when she exited her unmarked Ford Fusion to approach the driver's side of the GMC Yukon, she tucked in her shirt so her badge would be visible. Tr. 13:22-25, 40:22-41:2. According to Officer Johnson, she wore her badge on her belt in front of her holster so that the badge is "very visible" and "if you see [her]

gun, you see [her] badge."[3]  Tr. 11:18-12:7.  Officer Johnson also testified that Defendant later mentioned that "he saw [Officer Johnson's] firearm," which was located behind her badge when she approached the GMC Yukon.  Tr. 31:1-10, 52:6-9.  Officer Johnson tapped on the driver's side window and Defendant made eye contact with Officer Johnson when she tapped on his window.  Tr. 14:7-8, 17:9-15, 51:22-23.  When Officer Johnson asked him about the registration for the GMC Yukon, Defendant put the vehicle in gear and fled.  Tr. 14:7-14, 52:4-5.  While Officer Johnson did not identify herself as a police officer during this time, under these circumstances, the Court finds that a reasonable person would have known that he was being stopped by law enforcement, and thus, officers had probable cause to arrest Defendant for the crime of fleeing a peace officer.  Even further, while Defendant was fleeing on foot, Officer Wegner *did* identify himself as a police officer and ordered Defendant to stop, but Defendant continued to run away from him.  *See* Ex. D-1 at 01:16-01:27.

Nonetheless, even assuming that Defendant did not know that they were police officers, his perception "is not relevant because [courts] draw [their] conclusion from the facts known to the arresting officer at the time of the arrest."  *See Flores-Lagonas*, 993 F.3d at 561 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.")).  Here, Officer Johnson approached the

---

[3] The Court notes that Officer Wegner's body camera depicts the location of Officer Johnson's gun, holster, and badge.  *See, e.g.,* Ex. D-1 at 08:16-08:21.  The Court observes that Officer Johnson wears her gun on the right side of her belt, and her badge appears to be on the front of her belt, a few inches away from her gun and holster.  The badge is nearly fully visible in the body camera, but her shirt is covering the very top portion of her badge.  Nonetheless, it is clear to this Court that Officer Johnson was displaying a badge on her belt.

GMC Yukon to investigate Defendant for missing vehicle registration in violation of Minnesota law. *See* Tr. 14:7-12, 51:24-52:1; *see also* Minn. Stat. 169.79, subd. 1 ("No person shall operate, drive, or park a motor vehicle on any highway unless the vehicle is registered in accordance with the laws of this state and has the number plates or permit confirming that valid registration or operating authority has been obtained . . . displayed thereon in a manner that the view of any plate or permit is not obstructed."). At the time of the arrest, the officers knew the following facts: they were acting in the lawful discharge of their duties; Officer Johnson displayed her badge on her belt so it would be "very visible"; Defendant made eye contact with Officer Johnson and fled quickly from her; Defendant drove away erratically, crashed the GMC Yukon, and fled from the vehicle on foot; Officer Wegner identified himself as a police officer as he was running after Defendant; Officer Wegner shouted for Defendant to stop; and Defendant continued running until he was tackled by Officer Wegner. Considering the totality of the circumstances and the facts known to the officers at the time of the arrest, the Court finds that the officers had probable cause to believe Defendant was engaged in criminal activity. Accordingly, the arrest and subsequent search of Defendant's person did not violate his Fourth Amendment rights.

Further, even assuming for sake of argument that officers did not have probable cause to arrest Defendant for fleeing, officers nonetheless had probable cause to arrest Defendant for reckless driving, in violation of Minn. Stat. 169.13, subd. 1(a). Officer Johnson testified that when Defendant fled in the GMC Yukon, he drove up over the curve, over the sidewalk, then crossed over the road, went up onto the sidewalk and through some

yards on the opposite side of the road, then drove back onto the road.  Tr. 14:15-15:5.  The GMC Yukon ultimately came to a stop when it went through a yard, crashed into a fence, and got caught in the fence.  Tr. 15:7-11.  Notwithstanding the fleeing from peace officers, Officer Johnson's personal observation of Defendant's erratic driving gave her probable cause to arrest him for reckless driving.  *See Garcia v. City of St. Paul*, No. 09-cv-83 (JNE/AJB), 2010 WL 1904917, at *5 (D. Minn. May 10, 2010) (citing Minn. Stat. § 169.13, subd. 1(a) ("A person who drives a motor vehicle . . . while aware of and consciously disregarding a substantial and unjustifiable risk that the driving may result in harm to another or another's property is guilty of reckless driving."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in h[er] presence, [s]he may, without violating the Fourth Amendment, arrest the offender.")); *see also Flores-Lagonas*, 993 F.3d at 561 (same).

Lastly, Defendant's contentions that the officers did not have probable cause to arrest Defendant because Officer Johnson "knew immediately upon looking at [Defendant] up close that he was not the suspect in the stolen-car investigation," and that there is no indication in the record that the GMC Yukon was actually stolen, are irrelevant.  As already discussed, Defendant's "actions furnished independent grounds for arrest."  *See Flores-Lagonas*, 993 F.3d at 560.  Officers had probable cause to arrest him for fleeing a peace officer in a motor vehicle, fleeing a peace officer on foot, and reckless driving.  Each of those criminal offenses alone or in combination provided sufficient probable cause for the officers to arrest Defendant.  *See Atwater*, 532 U.S. at 354.

20

In sum, the Court finds that the officers had probable cause to believe that Defendant was engaged in criminal activity. Therefore, his arrest and the subsequent search of his person did not violate Defendant's Fourth Amendment rights. Accordingly, the Court recommends that Defendant's motion with respect to his argument that evidence recovered from the search of Defendant's person must be suppressed because officers lacked the necessary probable cause to arrest or search Defendant be denied.

### B. Warrantless Search of the GMC Yukon

Defendant also argues that the evidence recovered from the search of the GMC Yukon must be suppressed because the search was not constitutionally justified. Defendant contends that the Government cannot rely on the plain-view exception to the warrant requirement because the door of the Yukon was "manipulated without explanation, before sight of any contraband," and therefore, "the [G]overnment cannot prove that Off[icer] Johnson was lawfully in a position to see and seize the contraband that she saw through the manipulated door." Def.'s Mem. in Supp. at 9. Defendant also contends that the Government cannot rely on the inventory search exception because officers did not comply with the Richfield Police Department policy on inventory searches. *Id*. at 14-15.

The Government argues in response that the GMC Yukon search was justified under the automobile exception to the Fourth Amendment because Officer Johnson saw in plain view a firearm on the driver's side floorboard and what appeared to be methamphetamine on the driver's seat. Gov't Mem. in Opp. at 11-12. The Government also argues that even if Officer Johnson was not justified in searching the vehicle, the evidence would be

admissible under the inevitable discovery doctrine because the vehicle would have been subject to an inventory search prior to impoundment. *Id.* at 14.

### 1. Plain View

"Searches without a warrant are per se unreasonable subject to a few well established exceptions." *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004). One such exception is implicated by the "plain view" doctrine, which permits the lawful seizure of incriminating evidence that is in the "plain view" of the searching officers. *United States v. Murphy*, 69 F.3d 237, 241-42 (8th Cir. 1995). "Under the plain-view exception, officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010); *Horton v. California*, 496 U.S. 128, 136-37 (1990). "If an [item] is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton*, 496 U.S. at 136-37 (citations omitted). The "immediately apparent" requirement means that officers must have "probable cause to associate the [item] with criminal activity." *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990) (citations omitted). "[L]ooking through a parked car's windows is not a search for Fourth Amendment purposes." *United States v. Brown*, 653 F.3d 656, 661 (8th Cir. 2011). Thus, "[n]either probable cause nor reasonable suspicion is necessary for an officer to look through a window . . . of a vehicle so long as he or she has a right to be in close proximity to the vehicle." *Id.* (quoting *United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007)).

Here, the limited issue before the Court is whether officers observed the contraband in plain view of the GMC Yukon, or if the contraband was visible only after they manipulated the vehicle's door with the intent to uncover information. *See United States v. Cigolo*, No. 19-cr-272 (NEB/TNL), 2020 WL 4516913, at *14 (D. Minn. Apr. 27, 2020) (citing *United States v. Trower*, 285 F. App'x 321, 323 (8th Cir. 2008); *Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987)), *report and recommendation accepted* (D. Minn. June 26, 2020). "Stated differently, was the [GMC Yukon's] door open far enough to see the [contraband] at an angle or did [officers] open it wider before [they] w[ere] able to see the [contraband]?" *Cigolo*, 2020 WL 4516913, at *14.

This question can be answered easily by reviewing Officer Wegner's body camera video. *See* Ex. D-1. After arresting Defendant, Officer Wegner's body camera shows that he ran down the street and back to the GMC Yukon. *Id*. at 03:50-04:58. Officer Wegner then stood near the driver's side door of the GMC Yukon and looked into the vehicle through the window. *Id*. at 04:58-05:10. Officer Wegner did not touch the door or manipulate the door in any way. *See id*. Officer Wegner then returned to his car, *see id*. at 05:10-05:35, and then went to stand near the rear of the GMC Yukon, *see id*. at 05:35-06:29. Officers, including Officer Johnson, are heard on the body camera talking amongst themselves throughout this time. *See id*. Officer Wegner then said to Officer Johnson, "If you look on the driver's seat, you'll know why he ran." *Id*. at 06:30-06:32.

The video then shows Officer Wegner standing about a car-length away from the GMC Yukon speaking with other officers about Defendant's arrest. *Id*. at 06:32-07:14. Officer Wegner then says to the other officers, "There's a big ole bag of dope in the front."

23

*Id*. at 07:25-07:27. At this time, Officer Johnson is seen standing near the hood of the GMC Yukon. *Id*. at 07:28. The driver's door to the GMC Yukon is seen in the same "partially open" position that it was when Officer Wegner first ran over to the vehicle after arresting Defendant. *Id*. at 07:28; *accord, id*. at 06:05. In other words, it had not yet been "manipulated" or opened further by Officer Johnson or anyone else. Officer Johnson continued to stand near the hood of the GMC Yukon with the door still partially open. *See id*. at 07:51-07:54. She then walked back to talk with the other officers. *Id*. at 08:09. Later in the video, when the GMC Yukon comes back into view, the driver's door has been opened more widely, as depicted in Exhibit G-2. *See id*. at 08:29; *accord* Ex. G-2. The video then shows Officer Johnson walk back over to the GMC Yukon and conduct the search. *Id*. at 08:52-09:12.

Officer Johnson testified credibly that she could see the contraband without moving any doors or anything else. Tr. 35:24-37:16. This is further supported by Officer Wegner's body camera, which shows that he was able to observe the suspected narcotics from outside the vehicle, and Exhibits G-3 and G-5, which show suspected narcotics and a magazine directly sitting on the driver's seat. The Court, however, need not even reach the issue of whether Officer Johnson observed the contraband in plain view of the GMC Yukon, or if the contraband was visible only after she manipulated the vehicle's door, because Officer Wegner's knowledge of the suspected narcotics provided probable cause for Officer Johnson's search of the vehicle.

Officer Wegner clearly observed the suspected narcotics in plain view, which were located directly on the driver's seat. *See* Exs. G-3, G-5. Officer Wegner's body camera

shows him standing near the driver's side door of the GMC Yukon and looking into the vehicle through the window. *See* Ex. D-1 at 04:58-05:10. Less than a minute-and-a-half later, Officer Wegner told Officer Johnson, "If you look on the driver's seat, you'll know why he ran." *Id*. at 06:30-06:32. Then, he told the other officers, "There's a big ole bag of dope in the front." *Id*. at 07:25-07:27. This all occurred before the driver's side door was "manipulated" or opened more widely than it appeared when officers first arrived on scene. Contrary to Defendant's argument, the door of the GMC Yukon was *not* "manipulated without explanation, before sight of any contraband." *See* Def.'s Mem. in Supp. at 9. Thus, the suspected narcotics were in plain view, were observed from a lawful vantage point, and the incriminating character of the suspected narcotics was immediately apparent to Officer Wegner. *See Bynum*, 508 F.3d at 1137 (finding the seizure of a handgun constitutional under the plain view doctrine where the officer saw the gun in plain view through the open driver's door) (citing *United States v. Gillon*, 348 F.3d 755, 759-60 (8th Cir. 2003) (finding the seizure of drugs viewed through a vehicle's window constitutional under the plain view doctrine)).

The "collective knowledge" doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer when there is some communication between the officers. *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008); *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (holding that an officer's seizure of a gun case was appropriate because officers were exchanging information regarding their investigations and the officer who seized the item was part of a search team that otherwise had probable cause for the seizure). "This requirement distinguishes officers functioning

as a team from officers acting as independent actors who merely happen to be investigating the same subject." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005). "When officers function as a search team, it is appropriate to judge probable cause upon the basis of their combined knowledge, because '[courts] presume that the officers have shared relevant knowledge which informs the decision to seize evidence . . . .'" *Banks*, 514 F.3d at 776 (quoting *United States v. O'Connell*, 841 F.2d 1408, 1419 (8th Cir. 1988)).

Here, the Court finds the record demonstrates sufficiently that Officers Johnson and Wegner worked as a team throughout the pursuit, arrest, and search of Defendant and the GMC Yukon, and that they communicated as a team throughout the entire encounter. As discussed above, Officers Johnson and Wegner pursued Defendant together while he was fleeing and worked together to arrest him. Further, Officer Wegner's body camera video shows that he, Officer Johnson, and the other officers spoke to each other before Officer Johnson searched the GMC Yukon and throughout the entire processing of the scene. They shared relevant knowledge with one another, including when Officer Wegner told Officer Johnson, "If you look on the driver's seat, you'll know why he ran." *Id*. at 06:30-06:32. This provided "the requisite coordination and communication to impute [Officer Wegner's] knowledge of the [contraband] to Officer [Johnson]." *See Terry*, 400 F.3d at 581; *see also United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001) (holding that where an officer is "called to the scene to assist in an investigation that was ongoing, . . . there was the requisite degree of communication between him and the officers on the scene to make him a member of their team and thus to impute to him the knowledge that he team had acquired"). Thus, Officer Johnson was part of the "search team" that had probable

cause for the seizure of the contraband through Officer Wegner's discovery of it in plain view.

The lawful discovery of the contraband in the GMC Yukon also sufficed to create probable cause for Officer Johnson to believe that other parts of the vehicle contained additional contraband or evidence. *See United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (per curium). Thus, Officer Johnson's warrantless search of the vehicle was proper under the "automobile exception" to the warrant requirement. *See United States v. Rowland*, 341 F.3d 774, 784-85 (8th Cir. 2003); *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) ("[T]he automobile exception permits the warrantless search of a vehicle if the police had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.").

### 2. Inevitable Discovery

In the alternative, the Government argues that even if Officer Johnson was not justified in searching the vehicle, the evidence would be admissible under the inevitable discovery doctrine because the vehicle would have been subject to an inventory search prior to impoundment. Gov't's Mem. in Opp. at 14. For the reasons set forth below, the Court agrees.

Even where evidence would otherwise be suppressed due to an illegal search or seizure, it should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). For the inevitable discovery doctrine to apply, the Government must prove: "(1) that there was a reasonable probability

that the evidence would have been discovered by lawful means in the absence of police conduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *See United States v. Hammons*, 152 F.3d 1025, 1029 (8th Cir. 1998); *United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003) (citing *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999)).

Defendant argues that the Government cannot rely on the inevitable discovery exception because "officers did not complete a lawful inventory search." Def.'s Mem. in Supp. at 16 n.1. According to Defendant, because Officer Johnson "did not even attempt to follow Richfield's written policy," the search "cannot be justified under the inventory exception." *Id*. at 15-16. When applying the inevitable discovery doctrine, however, "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers *were reasonably likely to have done* had the unlawful recovery not occurred." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1019 (8th Cir. 2003) (emphasis added). In other words, whether Officer Johnson and the search of the GMC Yukon "satisfied the Eighth Circuit's inventory search standard is not the question presented before the Court; rather the question is whether an inventory search of the [GMC Yukon] conducted pursuant to [Richfield Police Department's] policy *would have* inevitably found the [contraband]." *See United States v. Vang*, No. 17-cr-104 (RHK/FLN), 2017 WL 9274908, at *7 (D. Minn. July 25, 2017) (emphasis added), *report and recommendation adopted* (D. Minn. Sept. 27, 2017); *see also Alvarez-Gonzalez*, 319 F.3d at 1072 ("There is also a reasonable probability that [the defendant's] vehicle would have been towed, rather than left of the shoulder of the interstate, and a routine inventory search

would have been conducted. Thus, the firearm would have been inevitably discovered during an inventory search of the vehicle."); *United States v. Marcks*, No. 19-cr-340 (MJD/BRT), 2020 WL 7685452, at *8 (D. Minn. Nov. 9, 2020) ("[E]ven if [the detective] had never conducted his roadside search of [the defendant's] bag, that bag would have been taken to [a police department], where it would have been subject to a thorough inventory search."), *report and recommendation adopted* (D. Minn. Dec. 15, 2020).

The Court finds that an inventory search of the GMC Yukon would have inevitably uncovered the contraband Defendant now seeks to suppress. According to the Richfield Police Department's Policy on Vehicle Impoundment (the "Policy"), officers may impound vehicles "[w]hen a suspect is arrested while driving or in control of a vehicle," or "when the officer has probable cause to believe the vehicle constitutes or contains evidence of a crime and impoundment is reasonably necessary to obtain or preserve evidence." Ex. G-7 at 1. "When a vehicle is impounded by an officer, an inventory search is required to protect property of the vehicle owner . . . [and] the officer and the tow company from false claims of theft or damage to the vehicle or property." *Id*. at 4. Under the Policy, "[a]n inventory search **shall** be conducted whenever a vehicle is impounded by an officer," and "[t]he inventory search should include the entire passenger compartment of the vehicle, including the glove compartment and the trunk." *Id*. (emphasis in original).

Here, Defendant was arrested after driving and fleeing from officers in the GMC Yukon, and Officer Johnson testified credibly that based on her training and experience, there was evidence of potential criminal activity in the vehicle. Thus, under the Policy, Officer Johnson was permitted to impound the GMC Yukon. An officer would then have

been required to conduct an inventory search of the GMC Yukon, and the drugs, gun, and ammunition found inside would have been discovered inevitably. The record establishes that there was a reasonable probability that the evidence recovered from the GMC Yukon would have been discovered inevitably during the course of a lawful inventory search conducted pursuant to standardized Richfield Police Department's Policy without any police misconduct.

Moreover, police were "actively pursuing a substantial, alternative line of investigation" that would have led to the discovery of any evidence otherwise obtained unconstitutionally. *See Hammons*, 152 F.3d at 1029. The evidence demonstrates that police located ammunition on Defendant's person before Officer Johnson searched the vehicle. Minneapolis Police Department Officer Nicholas Sciorrotta, Jr.'s body camera video shows that officers recovered ammunition from Defendant's person at about 2:32 p.m. *See* Ex. D-2 at 04:08. Officer Wegner's body camera video shows that Officer Johnson did not begin to search the vehicle until about 2:35 p.m. *See* Ex. D-1 at 08:52-09:12. Thus, even before the GMC Yukon was searched, it would have been reasonable for police to believe the GMC Yukon contained evidence of the arrest in the form of a firearm. As such, officers were permitted to search the vehicle on that basis. *See, e.g., Winarske*, 715 F.3d at 1068 ("Police may search a vehicle incident to a recent occupant's arrest only if . . . it is reasonable to believe the vehicle contains evidence of the offense of arrest."); *see also United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (holding that child pornography seized in a search of the defendant's home did not have to be suppressed because drug paraphernalia found on the defendant's person when he was

arrested would have given officers enough probable cause to obtain a search warrant that would have ultimately led to the discovery of the pornography). Because there is a reasonable probability that the evidence would have been discovered by lawful means and police officers were actively pursuing a substantial, alternative line of investigation, the Court finds that the evidence found in the GMC Yukon, even if obtained unlawfully, would have been inevitably discovered. Therefore, the evidence need not be suppressed.

In sum, the Court finds that the officers had probable cause to search the GMC Yukon. Further, even assuming Officer Johnson was not justified in searching the vehicle, the evidence would be admissible under the inevitable discovery doctrine. Accordingly, the Court recommends that Defendant's motion with respect to his argument that evidence recovered from the search of the GMC Yukon must be suppressed because officers lacked the probable cause to search the vehicle be denied.

### C. Buccal Swab

Defendant next argues that the DNA evidence collected from the buccal swab must be suppressed because his condition made it impossible for him to consent voluntarily. In response, the Government argues that Defendant's consent was voluntary. For the reasons set forth below, the Court agrees with the Government.

"While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain . . . voluntary consent." *United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (quoting *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011)). "Once an individual provides voluntary consent for a buccal swab, the officer does not need a warrant or probable cause to proceed with the

collection of his DNA." *United States v. Welch*, No. 17-cr-251 (ADM/HB), 2018 WL 1756110, at *3 (D. Minn. Jan. 2, 2018) (citations omitted), *report and recommendation adopted* (D. Minn. Feb. 7, 2018). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The issue of consent is a question of fact that requires consideration of the totality of the circumstances. *United States v. Severe*, 29 F.3d 444, 446 (8th Cir. 1994); *accord United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990); *Dunning*, 666 F.3d at 1165. The Court considers the following factors:

> (1) the individual's age and mental disability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Dunning*, 666 F.3d at 1165 (citing *Quintero*, 648 F.3d at 667).

Defendant argues that two main factors weigh against a finding of voluntariness. Def.'s Mem. in Supp. at 5. First, Defendant contends that he was in the hospital having just suffered a head injury during his arrest. *Id*. According to Defendant, Officer Wegner fell directly on top of him and caused his head to hit a piece of ice covering the sidewalk,

which resulted in significant bleeding. *Id*. at 5-7. Second, Defendant contends that he swallowed a gram of heroin before the arrest. *Id*. at 7. Defendant argues that Officer Johnson was aware of both of these facts and admitted that Defendant appeared confused, and therefore no reasonable officer could have believed that Defendant was able to consent voluntarily to a bodily search. *Id*.

Considering all of the factors, however, the Court finds that Defendant consented voluntarily to providing the DNA sample. While Defendant claimed to have ingested a gram of heroin, Officer Johnson testified credibly that none of the officers saw Defendant ingest heroin and Defendant did not appear to be intoxicated. *See* Tr. 28:17-29:3, 47:5-11. And although Defendant argues that Officer Johnson admitted that Defendant appeared confused after sustaining his head injury, Officer Johnson testified credibly that by the time she requested the DNA sample from Defendant at HCMC, he was "relaxing in the hospital bed" and his demeanor was "calm" and "normal." Tr. 28:14-16. Defendant seemed to understand the question Officer Johnson was asking him, appeared to be alert, and did not appear distraught or frightened. Tr. 28:17-29:3. Officer Johnson testified credibly that Defendant's consent was coherent and he knew what he was doing. *See* Tr. 29:17-21.

Further, the Court has reviewed Officer Wegner's and Officer Sciorrotta's body camera videos. *See generally* Exs. D-1, D-2. Officer Sciorrotta arrived on scene moments after Defendant was tackled to the ground by Officer Wegner, and he interacted with Defendant while he was treated by medics in the ambulance. *See* Ex. D-2 at 01:34-15:30. The Court agrees with Officer Johnson's assessment that Defendant appeared coherent and that he knew what was going on. For example, almost immediately after his arrest and

sustaining the head injury, Defendant asked Officer Sciorrotta, "What am I under arrest for?" Ex. D-2 at 01:43-01:45. He also said, "I didn't know you were the police." *Id*. at 01:48-01:50. Defendant therefore seemed to not only indicate an understanding that he was being arrested, but he also provided an explanation for why he ran from police. Although he did not cooperate fully with officers' instructions during the arrest, including not standing still during the search of his person and refusing to answer officers' questions about his name, the video shows that he understood what was happening. For instance, while in the ambulance, he asked what he did, what was going to jail for, and repeatedly said, "I don't wanna go to jail." *Id*. at 10:54-10:55, 11:27-11:33, 12:15-17, 12:25-27. There is nothing in the record that demonstrates to this Court that Defendant was either so intoxicated or impaired from the head injury "to the extent that he was unable to exercise a free choice." *See United States v. Eastman*, 256 F. Supp. 2d 1012, 1021 (D.S.D. Feb. 10, 2003).

Moreover, Defendant is an adult and apparently of normal mental ability. Additionally, "[a]lthough [Defendant] was not read his *Miranda* rights prior to the search, he was experienced in the legal system and likely aware of his rights." *Dunning*, 666 F.3d at 1165. As the Government also points out, Defendant even demonstrated his knowledge of the protections that the legal system provides for suspected criminals by later invoking his *Miranda* rights and declining to provide a formal statement. Moreover, the detention was not unduly lengthy, consent was given in a public hospital, and Defendant voiced no objections to providing the DNA sample. *See* Tr. 28:12-13. Officer Johnson testified credibly that she did not make any threats to Defendant, did not brandish her firearm, did

not lie to Defendant about why she was there, and did not promise Defendant anything in return for the DNA sample. *See* Tr. 29:8-16. Defendant has not argued, nor does the record reflect, that Officer Johnson used any threats, physical intimidation, or punishment to extract consent, or that she made any promises or misrepresentations to Defendant prior to the search. The fact that the request was made while Defendant was in custody, although relevant, was not enough to vitiate his consent. *See United States v. Flores*, 474 F.3d 1100, 1104-05 (8th Cir. 2007). Balancing the relevant considerations, the Court finds that the totality of the circumstances supports a finding of voluntariness and knowledge.

In sum, considering the totality of the circumstances, the Court finds that Defendant consented voluntarily and knowingly to Officer Johnson retrieving his DNA sample via a buccal swab. Accordingly, to the extent Defendant seeks to suppress the DNA swab and evidence derived from the swab, the Court recommends that the motion be denied.

### D. Custodial Interrogation

Defendant next argues that his statements must be suppressed because he was subjected to custodial interrogation without the benefit of *Miranda* warnings. Defendant argues that Officer Johnson engaged in custodial interrogation when she surmised that the gun was stolen, inviting Defendant to respond. Def.'s Mem. in Supp. at 18. Defendant contends that Officer Johnson "engaged in conduct reasonably likely to elicit a response from [Defendant] while he was in custody," and "the statements he gave must [therefore] be suppressed." *Id*. at 17.

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S.

291, 300-01 (1980). The "functional equivalent" of interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301; *see also United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). "[W]hether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given." *United States v. Allen*, 247 F.3d 741, 765 (8th Cir. 2001); *see also Innis*, 446 U.S. at 301 (noting that the interrogation analysis "focuses primarily upon the perceptions of the suspect, rather than the intent of police"). *Miranda* does not "protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) (citation omitted); *see also United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005).

The Government does not contest that Defendant was in custody when he spoke with Officer Johnson at HCMC, and Defendant does not assert that Officer Johnson asked him express questions. Thus, the issue is whether *Miranda* was triggered when Officer Johnson made statements that she should have known were reasonably likely to elicit an incriminating response. According to Defendant, by "expressing an unfounded assumption about the charges and whether the gun was stolen[, Officer Johnson] was reasonably likely to elicit an incriminating response." Def.'s Mem. in Supp. at 18.

Here, Officer Johnson testified credibly that after she collected a DNA sample,

Defendant "initiated more conversation." Tr. 29:22-25. Defendant started the conversation with Officer Johnson by asking her "what his charges would be." Tr. 30:1-3, 31:21-22, 47:23-48:1. Officer Johnson testified that, in response:

> [She] mentioned the firearm in the vehicle. [She] mentioned that [she] assumed it was probably stolen, so that would be an additional charge, and then [she] talked about the amounts of the drugs and believed based on what [she] saw it was probably a second or third degree possession charge.

Tr. 30:6-12. In response to Officer Johnson saying that the gun was probably stolen, Defendant said, "probably." Tr. 30:13-15. In response to Officer Johnson mentioning potential drug charges, Defendant "asked how much time he would get for 20 grams of meth and four grams of heroin." Tr. 30:16-21. Officer Johnson then looked up the criminal statutes on her phone for him to go through. Tr. 30:21-22. The Court finds Officer Johnson's testimony credible that she did not ask Defendant any questions, did not initiate any topics of conversation with Defendant, and only responded to Defendant's unprompted questions. *See* Tr. 31:16-24, 33:5-7.

Considering these facts, the Court finds that there was no interrogation because Officer Johnson simply answered Defendant's question. *See United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (citing *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008)) ("[A]n officer's response to a defendant's question does not amount to interrogation."). Defendant asked Officer Johnson a direct question about what he would be charged with. Officer Johnson responded to that question to the best of her knowledge. *See United States v. Spencer*, No. 14-cr-322(1) (SRN/TNL), 2015 WL 3743023, at *5 (D. Minn. June 15, 2015) ("Defendant asked [the officer] a direct question

about the charge underlying the outstanding warrant for his arrest. [The officer] did not interrogate Defendant for *Miranda* purposes by answering his question and informing him of the charge on the warrant to the best of his knowledge.").  Further, the Court finds that Officer Johnson did not mislead Defendant with her response, and it is reasonable that Officer Johnson would respond to Defendant's question about the potential charges in the manner that she did.  Given the information known to her and her experience as a law enforcement officer, Officer Johnson explained properly the evidence that was recovered, her assumption that the gun was stolen, and the potential charges.  This was permissible. *See United States v. Huntington*, No. 20-cr-145 (ECT/BRT), 2021 WL 165112, at *5 (D. Minn. Jan. 19, 2021) (quotation and citation omitted) ("A law enforcement officer's mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory, and an inculpatory statement is not considered the product of custodial interrogation merely because it was made after the suspect has been told the charges against him."); *United States v. Durand*, No. 11-cr-228 (MJD/JJK), 2011 WL 5444112, at *6 n.10 (D. Minn. Oct. 24, 2011) ("An officer telling a suspect what is happening or what charges have been made against him is not 'interrogation' for *Miranda* purposes."), *report and recommendation adopted* (D. Minn. Nov. 9, 2011).

This is not a situation where Officer Johnson should have known that her words were reasonably likely to elicit an incriminating response.  Thus, Defendant was not interrogated, and his statements will not be suppressed.  Accordingly, the Court recommends that Defendant's motion to suppress statements because he was subjected to

custodial interrogation without the benefit of *Miranda* warnings be denied.

### E. Voluntariness of Statements

Lastly, Defendant argues that his statements must be suppressed because his medical condition rendered any statements involuntary.  He argues that "[g]iven the combination of the severe intoxication from the significant dose of heroin [he] had swallowed, along with the serious injury he suffered when Off[icer] Wegner tackled him onto rock-hard ice, all of [his] statements at HCMC are subject to suppression as involuntarily made."  Def.'s Mem. in Supp. at 17-18.

Generally, a statement is voluntary if it is not the result of police coercion, deception, or intimidation.  *Colorado v. Connelly*, 479 U.S. 157, 166 (1986).   The determination of whether a statement is voluntary requires consideration of the totality of the relevant circumstances.  *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *see also, e.g., United States v. Rank*, 2018 WL 4334067, at *2 (D.S.D. May 17, 2018) (listing factors courts consider, including: the length of the interview; its continuous nature; its location; the use of force; threats or promises; and misrepresentations; age; years of formal education, physical, and mental condition, intelligence level, and experience with law enforcement).  A statement is voluntary if it is "the product of an essentially free and unconstrained choice by [its] maker."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *contra United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005) ("A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.").  The Eighth Circuit has "repeatedly held that a voluntary statement

made by a suspect, not in response to interrogation, is not barred. . . and is admissible with or without the giving of *Miranda* warnings." *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (quotations and citations omitted); *see also United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995); *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996).

For similar reasons discussed *supra* with respect to Defendant's argument about the voluntariness of his consent to provide a DNA sample, the Court finds that Defendant's statements were voluntary. Despite Defendant's claim that he ingested a gram of heroin prior to his arrest, the Court finds credible Officer Johnson's testimony that Defendant did not appear to be intoxicated. *See* Tr. 28:17-29:3, 47:5-11. The Court also finds credible Officer Johnson's testimony that Defendant had a "calm" and "normal" demeanor, despite Defendant's argument that he suffered a "serious injury" to his head during the arrest. *See* Tr. 28:14-16. According to Officer Johnson's credible testimony and the Court's review of the body camera videos, Defendant did not appear to be so intoxicated or otherwise so impaired from the head injury that he could not make a "free and unconstrained choice" to make a statement voluntarily. *See Schneckloth*, 412 U.S. at 225; *see also* Tr. 28:17-29:21; *see also* Ex. D-2 at 01:34-15:30. Instead, as Officer Johnson described, he seemed generally calm and coherent.

Moreover, as already discussed, Defendant is an adult and appeared to be of normal mental ability. He was experienced in the legal system and likely aware of his rights. Defendant initiated the exchange with Officer Johnson, and there is no indication that Defendant was coerced into making any statements. The exchange between Officer Johnson and Defendant took only about ten minutes, *see* Tr. 31:25-32:6, and Defendant

has not argued, nor does the record reflect, that Officer Johnson used any threats, physical intimidation, or punishment to extract consent, or that she made any promises or misrepresentations to Defendant prior to the exchange. Further, the Court finds that Defendant's capacity to resist any pressure to provide a statement or confess to a crime was not impaired by any alleged intoxication or injury. Thus, the Court does not find Defendant's argument persuasive that his statements must be suppressed because they were not voluntary.

In sum, the record as a whole shows that Defendant's statements were voluntary. As such, the Court recommends that Defendant's motion to suppress his statements on the grounds that his statements were not voluntary be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment, ECF No. 21, be **DENIED**.

2. Defendant's Motion to Suppress Statements, Admissions, and Answers, ECF No. 22, be **DENIED**.

Date: September __12__, 2022                    _____*s/Tony N. Leung*_____
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota

                                                *United States v. Young*
                                                Case No. 22-cr-79 (NEB/TNL)

## **NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.