# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-79 (NEB/TNL) |
| Plaintiff, | |
| v. | ORDER ON REPORT AND RECOMMENDATION |
| JYRON MENDALE YOUNG, | |
| Defendant. | |

This matter is before the Court on Defendant Jyron Mendale Young's objection to the September 12, 2022 Report and Recommendation ("R&R") of United States Magistrate Judge Tony N. Leung. Judge Leung recommends denying Young's motion to suppress evidence obtained in violation of the Fourth Amendment and his motion to suppress his statements, admissions, and answers at the hospital. After a *de novo* review, the Court overrules Young's objection and accepts the R&R.

## BACKGROUND

The R&R details the facts and procedural history of this case, (ECF No. 39 ("R&R") at 2–13), which are undisputed apart from one objection that the Court overrules below. The Court incorporates the R&R's summary and repeats the facts necessary for context.[1]

---

[1] The Court cites the R&R and incorporates the citations it contains.

### A.    Initial Contact, Pursuit, and Arrest of Young

On February 16, 2022, Officer Amanda Johnson received a call about a car stolen in Richfield. (R&R at 3.) The stolen vehicle was a black Jeep located at the 2600 block of 17th Avenue in Minneapolis. (*Id.*) Officer Johnson learned that the suspect was a Black male named Willie Scott, Jr. who had facial tattoos. (*Id.* at 4.) She learned that officers had observed Scott getting picked up from a house on that block. (*Id.* at 3.) And Officer Johnson also knew that when the victim of the stolen Jeep arrived at that house to recover the Jeep, officers saw a white GMC Yukon sport utility vehicle ("SUV") pull up in front of the house. (*Id.*)

When Officer Johnson arrived at that residence, she saw a GMC Yukon parked outside without license plates or registration. (*Id.*) The absence of plates concerned Officer Johnson, she testified, because cars involved in criminal activity usually have them removed. (*Id.*) Officer Johnson got "a pretty quick glimpse" of the SUV's driver and thought that the description of Scott was "[s]imilar enough [to Young] that at that glance it worth checking into further." (*Id.* at 4.) She also noted that its location was suspicious because it was where officers had seen Scott. (*Id.*)

Officer Johnson parked behind the GMC Yukon. (*Id.*) As an investigator, she drives an unmarked car and wears plainclothes. (*Id.* at 2.) Officer Johnson testified that she positions her police badge on her belt in front of her firearm and holster. (*Id.*) And when she takes police action, she regularly tucks in her shirt to make her badge "very visible."

(*Id.* at 3.) In Officer Johnson's words, "if you see [her] gun, you see [her] badge." (*Id.*) When she approached the GMC Yukon, Officer Johnson was in plainclothes and she tucked in her shirt to make her badge visible. (*Id.* at 4.)

Officer Johnson tapped on the GMC Yukon's window and saw two people inside. (*Id.*) The driver, Young, was seated "up pretty high" and did not roll down the window. (*Id.*) Officer Johnson noticed that Young's facial tattoos did not match Scott's, so she knew that he was not Scott. (*Id.* at 5.) She asked Young about the SUV's registration, loudly enough that she thought he could hear her through the closed window. (*Id.*) Young drove away without responding. (*Id.*) Officer Johnson could not identify herself as a police officer before Young left. (*Id.*) Later, Young admitted that he saw her firearm. (*Id.* at 12.)

Young drove "up over the curve, over the sidewalk, then crossed over the road, went up onto the sidewalk and through some yards on the opposite side of the road, then drove back onto the road." (*Id.* at 5.) Officer Johnson called for backup and pursued Young without turning on her lights or siren. (*Id.*) Young stopped when he crashed into a fence. (*Id.*) When Officer Johnson reached the SUV, Young was in the driver's seat. (*Id.*) After revving the engine without the SUV moving, Young ran away. (*Id.*) Officer Johnson, along with Officer Christopher Wegner of the Bloomington Police Department, pursued him. (*Id.* at 5–6.)

Officer Wegner's body-camera footage captured what followed. (*Id.* at 6.) After radioing for backup, Officer Wegner ran after Young alongside Officer Johnson. (*Id.*) He

3

wore plainclothes as well. (*Id.*) Officer Wegner yelled, "Police! Stop!" (*Id.*) Young kept

running. (*Id.*) Officer Wegner eventually caught up with Young and tackled him to the

ground. (*Id.*) Young objects to the R&R's finding that Officer Wegner said anything

besides "Stop!" before he tackled him. (Obj. at 4.) He argues that it is hard to hear

anything else in the body-camera footage. (*Id.*) The Court disagrees. The body-camera

recording captures Officer Wegner shouting "Police! Stop!" before tackling Young. (Ex.

D-1 at 01:18–01:20.)

Officer Johnson testified that Officer Wegner was already on top of Young when

she reached them. (R&R at 6.) Young told the officers that he did nothing, then asked

them what he did and "[w]ho are you people?" (*Id.*) Officer Wegner explained that he is

a police officer and mentioned that they were looking for someone else when they noticed

the SUV did not have plates. (*Id.*) The officers arrested Young. (*Id.*)

### B.       *Searches of Young and the GMC Yukon*

The officers searched Young after his arrest. (*Id.* at 10.) They found a .9 millimeter

round and a .380 round. (*Id.*) Officer Wegner then ran back to the GMC Yukon. (*Id.* at 7.)

Officer Johnson testified that she got to the SUV around the same time. (*Id.*)

The officers searched the GMC Yukon. One of Young's objections hinges on the

angle of the SUV's door, so the Court emphasizes its position in its summary. Officer

Wegner's body-camera footage shows that he looked through the window of the SUV's

*partially-open* driver's door without touching it. (*Id.*; Ex. D-1 at 03:50–05:10) He told Officer

4

Wegner that "[i]f you look on the driver's seat, you'll know why he ran." (R&R at 7.) And he said that "[t]here's a big ole bag of dope in the front." (*Id.*) Officer Johnson testified that when she searched the GMC Yukon, the driver's door was *wide open*, as shown in the government's photograph. (ECF No. 35 ("Tr.") at 45; *see* Ex. G-2.) She testified that she saw Young open the door when he got out of the SUV, and to her knowledge nobody had interacted with the vehicle since then. (R&R at 7.) She presumed that Minnesota Police Department officers had secured it. (*Id.* at 8.)

After Officer Wegner mentioned the "dope" in the driver's seat, Officer Johnson looked inside the SUV through the open door. (*Id.*) She saw a Taurus 380 pistol on the floorboard; a magazine for a full-size weapon; a crystalline substance in a plastic baggy on the driver's seat that she suspected was methamphetamine; five-dollar bills and suspected heroin in the center console; and rounds of .380 caliber ammunition. (*Id.*) Officer Johnson testified that she could see these items without moving anything. (*Id.* at 8–9.) She also found a .9 millimeter handgun magazine in the driver's door, and the SUV's license plates in the back of the vehicle. (*Id.* at 9.) Officer Johnson concluded that the GMC Yukon may have been stolen and had it towed. (*Id.*)

### C. *Young's Statements and Buccal Swab at the Hospital*

Officers took Young to the hospital after his arrest. (*Id.* at 10.) He had a cut on his forehead from hitting his head on the ground when tackled and was "bleed[ing] pretty significantly." (*Id.*) Officer Johnson testified that Young seemed confused right after his

arrest. (*Id.*) Young claimed that he had ingested one gram of heroin, too. (*Id.*) Officer Johnson testified that "[n]obody actually saw him do any of that." (*Id.*)

After searching the GMC Yukon, Officer Johnson went to the hospital to ensure that Young remained in custody. (*Id.* at 10.) When there, she asked Young if he would provide a DNA sample with a buccal swab. (*Id.* at 11.) Officer Johnson testified that Young appeared calm, normal, and relaxed. (*Id.*) She also testified that Young appeared to understand her question, and he did not appear intoxicated. (*Id.*) Officer Johnson did not make any threats, brandish her firearm, lie about why she was there, or promise Young anything in return for the sample. (*Id.*) Young consented. (*Id.*)

After collecting the sample, Young "initiated more conversation" by asking Officer Johnson what his charges would be. (*Id.*) They talked for about ten minutes. (*Id.* at 13.) Officer Johnson mentioned the firearm in the GMC Yukon and that she assumed it was stolen, noting that would be an additional charge. (*Id.* at 11.) She also mentioned the narcotics, saying she thought they would lead to a second or third degree possession charge. (*Id.*) Young admitted that the firearm was "probably" stolen. (*Id.* at 11–12.) And he "asked how much time he would get for 20 grams of meth and four grams of heroin." (*Id.* at 12.) Young also admitted that he was "trying to make money" in the GMC Yukon. (*Id.*) Officer Johnson testified that she did not ask Young any questions or initiate any conversation topics with him while at the hospital. (*Id.* at 13.) Later, Officer Johnson asked Young if he wanted to be interviewed, and he declined. (*Id.*)

D.     *Procedural History*

Young was charged in a four-count indictment. (ECF No. 12.) Count 1 and Count 2 charge Young as an armed career criminal with being a felon in possession of a firearm and ammunition, each in violation of 18 U.S.C. Sections 922(g)(1) and 924(e)(1). (*Id.*) Count 3 charges Young with possession with intent to distribute controlled substances in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C). (*Id.*) And Count 4 charges him with carrying a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. Section 924(c)(1)(A). (*Id.*) Young moved to suppress evidence obtained in violation of the Fourth Amendment. (ECF No. 21.) And he moved to suppress his statements, admissions, and answers at the hospital. (ECF No. 22.) At the hearing on the motions, Judge Leung heard testimony from Officer Johnson. In the R&R, Judge Leung recommends denying Young's motions, and Young objects.

## ANALYSIS

The Court reviews the portions of the R&R to which Young objects *de novo*. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. LR 72.2(b)(3). Young makes five objections. First, he argues that his warrantless arrest and search were not supported by probable cause. Second, he contends no valid warrant exception permitted the search of the GMC Yukon. Third, he maintains that he could not voluntarily consent to the buccal swab. Fourth, he argues that his statements at the hospital were similarly involuntary. Fifth, he asserts that his un-*Mirandized* statements at the hospital must be suppressed.

## I.      Warrantless Arrest and Search of Young

Young argues that Officers Johnson and Wegner lacked probable cause for his arrest because the officers knew upon looking at Young that he was not Scott. He contends that he did not flee from the officers because he did not know that they were the police. And he insists that the officers' failure to properly identify themselves was the but-for cause of any reckless driving. Young does not argue that the officers impermissibly approached him while he was parked in the GMC Yukon—neither in his original suppression motion nor his objection to the R&R.

"Probable cause is required for a warrantless arrest." *United States v. Green*, 9 F.4th 682, 690 (8th Cir. 2021). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (quoting *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012)). It "is a practical and common-sense standard that is based on the totality of the circumstances and requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (cleaned up, citation omitted). Probable cause is assessed "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case." *United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) (citation omitted). Officers need not "witness a crime or have all the evidence needed to sustain a conviction; instead, officers only need a probability or substantial

chance of criminal activity, rather than an actual showing of criminal activity." *Green*, 9 F.4th at 690 (quotation marks and citation omitted). The Eighth Circuit has "consistently held that a defendant's response to an arrest or *Terry* stop—even an invalid one—may constitute independent grounds for arrest." *United States v. Flores-Lagonas*, 993 F.3d 550, 560 (8th Cir. 2021); *see generally Terry v. Ohio*, 392 U.S. 1 (1968).

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). The officer may then conduct "a search incident to a lawful arrest," which extends to "the arrestee's person and the area within his immediate control." *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010) (citations omitted).

The R&R concluded that law enforcement had probable cause to arrest Young, and therefore search him, for three violations of Minnesota law: attempting to flee from the police in the SUV, attempting to flee by foot, and reckless driving. (R&R at 16–21.) The Court agrees with the R&R on all three violations, each of which independently provides probable cause for arrest.

*Attempt to flee by vehicle*. Under Minnesota law, "[w]hoever by means of a motor vehicle flees or attempts to flee a peace officer who is acting in the lawful discharge of an official duty, and the perpetrator knows or should reasonably know the same to be a peace officer, is guilty of a felony . . . ." Minn. Stat. § 609.487 subdiv. 3. When Officer

Johnson tapped on the window of Young's GMC Yukon, Young put the SUV in gear and drove away. Young argues that Officer Johnson did not identify herself as law enforcement, so he did not know and reasonably could not have known that she was an officer. And so, he argues, he did not flee.

The question, then, is whether Young reasonably should have known that Officers Johnson and Wegner were police. The answer is yes. On one hand, Officer Johnson's car was unmarked. (Tr. at 11.) She was in plainclothes and did not identify herself as an officer when she tapped on the window of Young's GMC Yukon. (*Id.* at 10, 41.) And Young asserts that he did not see Officer Johnson's badge because he was sitting "up pretty high" in the GMC Yukon. (Obj. at 2–3 (quoting Tr. at 40).) On the other hand, Officer Johnson testified that Young confirmed that he saw her firearm when she first approached the GMC Yukon. (Tr. at 31.) Officer Johnson testified that when she left her car, she tucked in her shirt so that her badge would be visible. (*Id.* at 13–14, 40.) And she explained that she regularly positions her badge on her belt in front of her holster, so it is "very visible." (*Id.* at 11–12; *see also id.* at 52 (explaining that her firearm and belt "touch[] each other").) "[I]f you see the gun, you see the badge." (*Id.* at 11.) And she testified that she asked for the vehicle's registration. (*Id.* at 14, 52.) In totality, given that Young saw Officer Johnson's firearm, the position of her badge, and her request for the vehicle's registration, the Court concludes that a reasonable person should have known that Officer Johnson was a police officer.

*Attempt to flee on foot.* "Whoever, for the purpose of avoiding arrest, detention, or investigation, . . . attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running, hiding, or by any other means except fleeing in a motor vehicle, is guilty of a misdemeanor." Minn. Stat. § 609.487 subdiv. 6. After Young crashed the GMC Yukon into a fence, he got out of the SUV and ran from Officers Johnson and Wegner. (Tr. at 15–16.) Young objects to the R&R's finding that Officer Wegner identified himself as law enforcement during that chase. (Obj. at 4.) As discussed, the body-camera footage shows Officer Wegner shouting that he is a police officer as Young ran from him. (Ex. D-1 at 01:18-01:20.) The officers therefore had probable cause to arrest Young for fleeing on foot.

*Reckless driving.* The R&R concludes that Officers Johnson and Wegner had probable cause to arrest Young for reckless driving as well. "A person who drives a motor vehicle . . . while aware of and consciously disregarding a substantial and unjustifiable risk that the driving may result in harm to another or another's property is guilty of reckless driving." Minn. Stat. § 169.13 subdiv. 1(a). Officer Johnson testified that Young "went up over the curve, over the sidewalk, crossed over the road, went through some other yards on the opposite side of the road through sidewalks and yards there, back on the road and, a lot of off-road driving." (Tr. at 14.) Young then "crashed into a fence and a yard and got hung up on the fence." (*Id.* at 15.)

Young asserts that the officers' unconstitutional actions caused his erratic driving, so it cannot be the basis of a lawful stop. (Obj. at 5–6.) As discussed, Young reasonably should have known that Officer Johnson was a police officer, unlike in the cases that Young cites as support. *Cf. Johnson v. Grob*, 928 F. Supp. 889, 897 (W.D. Mo. 1996) (concluding that the defendant was seized when she fled police officers because, with guns drawn, she "reasonably believed that her assailants were armed robbers"). Officer Johnson's observations of Young's driving gave her probable cause to arrest him for reckless driving. (R&R at 20); *see Atwater*, 532 U.S. at 354.

*Conclusion.* Law enforcement had probable cause to arrest Young for three separate violations of Minnesota law: fleeing law enforcement by vehicle, fleeing on foot, and reckless driving. Although Officer Wegner knew that Young's lack of facial tattoos meant that he did not steal the Jeep, Young's actions during the *Terry* stop "furnished independent grounds for arrest." *Flores-Lagonas*, 993 F.3d at 560. And because the officers lawfully arrested Young, the search incident to arrest did not violate his Fourth Amendment rights. *Perdoma*, 621 F.3d at 750.

## II.   Warrantless Search of the GMC Yukon

Young objects to the R&R's conclusion that the search of the GMC Yukon was constitutional under the plain-view exception to the warrant requirement. (Obj. at 7–9.) He also objects to the R&R's conclusion that the officers would have inevitably discovered the contraband in the SUV without a constitutional violation. (*Id.* at 8–9.)

A.      *Plain-View Exception*

"Searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *United States v. Muhammed*, 604 F.3d 1022, 1027 (8th Cir. 2010) (cleaned up, citation omitted). One such exception is the plain-view doctrine, which allows officers to "seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *Id.*

When it comes to parked cars, "[n]either probable cause nor reasonable suspicion is necessary for an officer to look through a window . . . of a vehicle so long as he or she has a right to be in close proximity to the vehicle." *United States v. Brown*, 653 F.3d 656, 661 (8th Cir. 2011) (citation omitted). Put simply, "looking through a parked car's windows is not a search for Fourth Amendment purposes." *Id.*; *see also United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007) (holding that the seizure of a handgun was constitutional when officers saw the gun in plain view through an open driver's door).

Young argues that the contraband in the GMC Yukon became visible to the officers only after someone moved the driver's door with intent look inside. (Obj. at 7–8.) His argument rests on Officer Johnson's testimony at the hearing. She testified that when she searched the GMC Yukon, the driver's door was wide open—not partially open. (Tr. at

45.) According to Young, "[s]omeone" must have adjusted the SUV's door between the time Officer Wegner's body camera shows it partially open and Officer Johnson later saw it wide open. (Obj. at 7.) It follows, Young argues, that there is "no credible evidence" that the contraband was in plain view. (*Id.* at 7–8.)

The Court disagrees. As the R&R reasons, Officer Wegner's body-camera footage shows that he saw the contraband by looking through the GMC Yukon's window without moving the door. After arresting Young, Officer Wegner returned to the SUV. (Ex. D-1 at 03:50–05:00.) The driver's door was partially open. (*Id.* at 05:00–05:05.) Officer Wegner looked through the door's window without touching it. (*Id.* at 05:05–05:10.) He returned to his car, then walked to the back of the GMC Yukon when backup arrived. (*Id.* at 05:10–06:30.) The video shows the door in the same partially-closed position. (*Id.* at 05:49, 06:05.) The officers talked among themselves. (*Id.* at 06:00–06:30.) Positioned away from the door, Officer Wegner said, "[i]f you look on the driver's seat, you'll know why he ran." (*Id.* at 06:30–06:32.) And he said that "[t]here's a big ole bag of dope in the front." (*Id.* at 07:25–07:27.) A minute later, the video shows the door wide open for the first time, matching the photographs of the GMC Yukon taken at the scene. (*Compare id.* at 08:29, *with* Ex. G-2.) Then Officer Johnson searched the SUV. (Ex. D-1 at 08:50–09:12.)

Not only does the body-camera footage belie Young's argument that someone moved the SUV's door before Officer Wegner discovered the contraband, but the contraband was in plain view on the driver's seat, as shown in the photographs. (*See* Exs.

G-3, G-4.) It makes sense that Officer Wegner could see it through the window. Once he did, the officers had probable cause to search the rest of the SUV. *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) ("[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" (citation omitted)).

### B.    *Inevitable Discovery*

In the alternative, the R&R concludes that even if Officer Johnson illegally searched the GMC Yukon, the evidence is still admissible under the inevitable-discovery doctrine. (R&R at 27–31.) Young maintains that the doctrine is inapplicable because his arresting officers did not conduct an inventory search of the SUV, so they would have never discovered the contraband had they not illegally searched it. (Obj. at 8–9.)

"If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," the exclusionary rule does not apply regardless of any illegal government activity. *Nix v. Williams*, 467 U.S. 431, 444 (1984). The government must make two showings: "(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997). The inquiry asks not "what the officers actually did after unlawfully recovering evidence,"

but "what the officers were reasonably likely to have done had the unlawful recovery not occurred." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1020 (8th Cir. 2003).

For two reasons, the Court agrees with the R&R that the contraband would have inevitably been discovered. First, the officers would have searched the GMC Yukon when they impounded it. Under Richfield Police Department Policy, "[w]hen a suspect is arrested while driving or in control of a vehicle, the vehicle may be impounded for safekeeping." (Ex. G-7 at 1.) Vehicles may also be impounded "when the officer has probable cause to believe that the vehicle constitutes or contains evidence of a crime and impoundment is reasonably necessary to obtain or preserve evidence." (*Id.*) "When a vehicle is impounded by an officer, an inventory search is required to protect property of the vehicle owner." (*Id.* at 4.) The search "include[s] the entire passenger compartment of the vehicle, including the glove compartment and the trunk." (*Id.*)

Young was arrested for fleeing from the police in the GMC Yukon. Officer Johnson testified that GMC Yukon was missing license plates and markings for registration, which was "concerning" because "vehicles involving criminal activity" and "[s]tolen vehicles" tend to have the plates removed. (Tr. at 12–13.) Under the Policy, the officers could impound the SUV, and would then have to search it. (Ex. G-7 at 1, 4.) Young's argument that the officers here never conducted an inventory search, and thus would not have inevitably discovered the contraband, ignores that the officers had no need to do an

inventory search because they had already searched the vehicle after seeing contraband, including at least one of the firearms, in plain view.

Second, the officers had probable cause to search the GMC Yukon based on the ammunition found on Young. Body-camera footage shows that the officers found the ammunition when they searched Young. (*See* Ex. D-2 at 04:08.) Three minutes later, Officer Johnson searched the SUV. (*See* Ex. D-1 at 08:50–09:12.) As the R&R reasons, the moment the officers discovered the ammunition on Young, it would have been reasonable for them to suspect that there may have been a firearm in the SUV. *United States v. Winarske*, 715 F.3d 1063, 1068 (8th Cir. 2013) ("[P]olice may search a vehicle incident to a recent occupant's arrest only if . . . it is reasonable to believe the vehicle contains evidence of the offense of arrest." (citation omitted)). There is therefore a reasonable probability that law enforcement would have discovered the contraband through ongoing, alternative lines of investigation.

### III.   Voluntariness of Young's Consent to Buccal Swab

Young next objects to the R&R's conclusion that he voluntarily consented to the buccal swab. (Obj. at 10.) "While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain . . . voluntary consent." *United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (citation omitted). "The government bears the burden of proving voluntary consent." *Id.* (citation omitted).

The voluntariness of consent is a "totality of the circumstances" inquiry, in which courts consider numerous factors:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id.* (citation omitted); *see also Miranda v. Arizona*, 384 U.S. 436 (1966). Young argues that his head injury from the arrest and ingestion of a gram of heroin made him unable to voluntarily consent. (Obj. at 10.)

The Court agrees with the R&R's balancing of the factors. On one hand, Young insists that he swallowed a gram of heroin and that he was confused because of his head injury. And Officer Johnson testified that right after Young hit his head, he seemed confused about what was happening. (Tr. at 46.)

On the other hand, Officer Johnson testified that later, at the time Young consented to the buccal swab, he seemed "[c]alm" and "normal" and was "relaxing in the hospital bed." (*Id.* at 28.) She testified that he appeared to understand her questions, was alert and coherent, and did not look intoxicated. (*Id.* at 28–29.) And she noted that nobody saw him swallow heroin. (*Id.* at 47.) Also, the body-camera footage of Young just after his head

injury confirms that he was coherent and asking and answering many questions. At the hospital, which is a public place, Officer Johnson did not make any threats, brandish her firearm, lie about why she was there, or promise Young anything in return for the sample. (Tr. at 29.) As for *Miranda*, although Officer Johnson did not read Young the warnings, Young has multiple prior felony convictions and later asserted his rights by declining to provide a formal statement. (*Id.* at 32.) That assertion suggests his familiarity with the legal system, mitigating the harm from the lack of warnings. *See Dunning*, 666 F.3d at 1165 ("Although Dunning was not read his *Miranda* rights prior to the search, he was experienced in the legal system and likely aware of his rights."). On balance, the Court agrees with the R&R that Young's consent to the buccal swab was voluntary.

## IV.    Voluntariness of Young's Statements at the Hospital

Young objects to the R&R's similar conclusion that his statements at the hospital were voluntary. He again presses his arguments about swallowing a gram of heroin and his head injury. "The government must prove by a preponderance of the evidence that the defendant's statements were voluntary." *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). Courts look at the totality of the circumstances. *Id.; see also Arizona v. Fulminate*, 499 U.S. 279, 285–86 (1991). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Brave Heart*, 397 F.3d at 1040 (citation omitted). The Eighth Circuit has "repeatedly declined to adopt a per se rule of

involuntariness when confronted with intoxication." *United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995). For the same reasons as above, the Court agrees with the R&R that the totality of the circumstances lead to the conclusion that Young's hospital statements were voluntary.

## V.    Custodial Interrogation

Young's final objection is to the R&R's conclusion that he was not under custodial interrogation at the hospital. (Obj. at 11.) The parties agree that Young was in custody and that Officer Johnson did not ask him express questions; they disagree whether the officer's statements were the functional equivalent to express questioning.

For *Miranda*'s safeguards to apply, defendants must be in custodial interrogation, which is "questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda*, 384 U.S. at 444. Questioning may be express or its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). The functional equivalent of express questioning is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* The focus is on the "perceptions of the suspect, rather than the intent of the police." *Id.* "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) (citation omitted); *see also*

*United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) ("[A]n officer's response to a defendant's question does not amount to an interrogation.").

Officer Johnson testified that after she collected the buccal swab, Young "initiated more conversation." (Tr. at 29.) He asked her "what his charges would be." (*Id.* at 30.) Officer Johnson testified that she "mentioned the firearm in the vehicle," "mentioned that [she] assumed it was probably stolen, so that would be an additional charge," and "talked about the amounts of the drugs and believed based on what [she] saw that it was probably a second or third degree possession charge." (*Id.*) As for the firearm, Young admitted that the gun was "probably" stolen. (*Id.*) As for the drugs, Young "asked how much time he would get for 20 grams of meth and four grams of heroin." (*Id.*) Officer Johnson researched the relevant statutes on her phone. (*Id.*) Young also volunteered that he was "trying to make money" in the GMC Yukon. (*Id.* at 31.)

At no point did Officer Johnson ask Young questions—it was Young doing the questioning. Nor were Officer Johnson's answers misleading. "A law enforcement officer's mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory." *United States v. Wipf*, 397 F.3d 677, 685 (8th Cir. 2005) (cleaned up, citation omitted). Accordingly, the Court agrees with the R&R that Young was not in custodial interrogation at the hospital.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Young's Objection (ECF No. 40) is OVERRULED;

2.      The Report and Recommendation (ECF No. 39) is ACCEPTED;

3.      Young's Motion to Suppress Evidence Obtained in Violation of the Fourth

        Amendment (ECF No. 21) is DENIED; and

4.      Young's Motion to Suppress Statements, Admissions, and Answers (ECF

        No. 22) is DENIED.


Dated: November 10, 2022                    BY THE COURT:

                                            s/Nancy E. Brasel
                                            Nancy E. Brasel
                                            United States District Judge